IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Teresa Kirby Edwards, | ) | C/A No. 1:20-cv-2280-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Sherri A. Lydon, United States District Judge, dated September 10, 2020, referring this matter for disposition. [ECF No. 11]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 10].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial

evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On March 13, 2018, Plaintiff filed an application for DIB in which she alleged her disability began on August 22, 2017. Tr. at 333, 399–402. Her application was denied initially and upon reconsideration. Tr. at 334–37, 342–47. On October 9, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Colin Fritz. Tr. at 256–92 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 18, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 17, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 261. She completed high school. *Id.* Her past relevant work ("PRW") was as a

warehouse worker and a convenience store cashier. Tr. at 263–67. She alleges she has been unable to work since August 22, 2017. Tr. at 399.

2.    Medical History

Plaintiff presented to Shannon Claye Webb, M.D. ("Dr. Webb"), on June 7, 2017. Tr. at 523. She requested refills, reporting she had been without medications "for a while." *Id.* She also stated her right knee felt swollen, although Dr. Webb indicated it did not appear to be swollen. *Id.* Plaintiff endorsed depressed mood, irritability, increasing joint pain, and skin psoriasis patches. *Id.* Her blood pressure was elevated at 144/97 mmHg and she was 5'8" tall and weighed 280 pounds. Tr. at 524. Dr. Webb noted morbid obesity, no edema, antalgic gait, and erythematous plaques with some adherent silvery scale about the extensor surfaces of Plaintiff's lower legs and forearms. *Id.* She restarted Plaintiff on Effexor XR 75 mg, Lisinopril-Hydrochlorothiazide 20-12.5 mg, Zolpidem 10 mg, Folic Acid 1 mg, Methotrexate 1.5 mg, and Lovastatin 20 mg. Tr. at 525.

On August 11, 2017, Plaintiff presented to Gary Don Rauch, M.D. ("Dr. Rauch"), with worsening depression over the prior week, as well as fatigue, nausea, and vomiting. Tr. at 506. She described feeling as if she were "in a cloud" and having become confused at work such that she forgot the day of the week. *Id.* Dr. Rauch noted Plaintiff's symptoms might be related to withdrawal after having run out of Effexor or to a urinary tract infection

("UTI"). Tr. at 507. He stated the exam was negative. *Id.* He ordered urinalysis. *Id.*

Plaintiff followed up with Dr. Webb for treatment of hypertension, cutaneous psoriasis, high cholesterol, depression, and insomnia on August 29, 2017. Tr. at 520. She endorsed depression, anxiety, and agitation and indicated her psoriasis and sleep had improved. *Id.* She noted she had been out of Lovastatin when she underwent fasting lab studies. *Id.* She endorsed leg swelling and denied shortness of breath, chest pain, myalgias, suicidal ideation, and mania. *Id.* Dr. Webb stated Plaintiff was obese at 5'8" tall and 271 pounds. *Id.* She noted 1+ bilateral pretibial edema and patches of erythema and adherent gray scale on her right posterior calf with less severe changes on the extensor surfaces of each elbow. *Id.* She increased Venlafaxine to 150 mg and Lisinopril-Hydrochlorothiazide to 40-25 mg daily and prescribed Lovastatin and Methotrexate. Tr. at 521.

On February 16, 2018, Plaintiff presented to the emergency room ("ER") at Spartanburg Regional Healthcare System ("SRHS") with a complaint of chest pain that had begun weeks prior. Tr. at 545. She noted she was supposed to be taking Lisinopril-Hydrochlorothiazide, but could not afford to follow up with her physician for refills. *Id.* Her blood pressure was elevated at 176/101 mmHg and she had trace bilateral lower extremity edema. Tr. at 546. A chest x-ray showed no acute abnormality. Tr. at 547.

Plaintiff's serum creatinine was elevated. *Id.* A cardiac workup was negative. Tr. at 548. Ladia M. Konz, M.D. ("Dr. Konz"), refilled Plaintiff's blood pressure medication, Methotrexate, and Effexor and referred her to a new primary care physician to establish treatment. *Id.*

Plaintiff presented to Gordon Early, M.D. ("Dr. Early"), for a consultative exam on May 14, 2018. Tr. at 552–54. She endorsed depression and a long history of hearing voices and indicated Dr. Webb had prescribed Prozac and Effexor. Tr. at 552. She complained of right lower extremity swelling that occurred with prolonged standing and bilateral knee arthritis that was worse on the right. *Id.* She indicated she had taken Methotrexate for psoriatic arthritis, but had stopped taking it four or five months prior because she could not afford it. *Id.* She stated her exercise tolerance was limited due to shortness of breath. Tr. at 553. She endorsed dyspnea on exertion and palpitations and admitted to being a lifelong smoker. *Id.* Dr. Early noted Plaintiff had a blunted affect and tight associations. Tr. at 552. He referenced marked varicose veins in Plaintiff's legs. *Id.* He observed a large Q angle at both knees. Tr. at 552–53. He described Plaintiff as "very depressed," indicating the Zung inventory suggested severe depression and he agreed with the assessment. Tr. at 553. He stated Plaintiff's posture was not consistent with back pain and she did not have much trouble walking the hallways or getting on the exam table. *Id.* He noted good range of motion

("ROM") of Plaintiff's neck, psoriatic plaques over five percent of her body that were worse in the intergluteal fold and on the left thigh, no psoriatic arthritis changes in the hands and toes, good ROM in the hands and upper extremities, nonpitting edema and varicose veins in both legs, right thigh circumference of 24.5 inches, left thigh circumference of 24 inches, bilateral knee flexion to 140 degrees with 2+ synovial inflammation, non-antalgic gait, and no shortness of breath upon ambulating 40 feet. Tr. at 553–54. Dr. Early assessed auditory hallucinations of unclear etiology and recommended a psychological evaluation. Tr. at 554. He indicated Plaintiff was a "poor candidate for standing on her feet all day" and a "poor candidate for activities involving crawling, bending, and stooping" given non-pitting right lower extremity swelling, venous stasis, and moderate knee arthritis. *Id.*

On May 23, 2018, state agency psychological consultant Xanthia Harkness ("Dr. Harkness"), reviewed the record, considered listing 12.04 for depressive, bipolar, and related disorders, and assessed Plaintiff's functional limitation as follows: mild difficulty understanding, remembering, or applying information; mild difficulty interacting with others; moderate difficulties in concentrating, persisting, or maintaining pace; and mild difficulties in adapting or managing oneself. Tr. at 298. She completed a mental residual functional capacity ("RFC") evaluation, noting Plaintiff was moderately limited as to her abilities to carry out detailed instructions and to

maintain attention and concentration for extended periods. Tr. at 302–03.

She wrote the following:

> She is able to remember location and work-like procedures. She is able to understand and remember short and simple instructions. She could not understand and remember semi-detailed instructions.

> She is able to carry out very short and simple instructions, but could not carry out detailed instructions. She is able to attend to and perform simple tasks without special supervision for at least 2-hour periods. She is able to understand normal work-hour requirements and be prompt within reasonable limits. She is able to work in proximity to others without being unduly distracted. She retains the ability to make simple work-related decisions. Her symptoms would not interfere with satisfactory completion of a normal workday/week or require an unreasonable number of rest or cooling off periods.

> She has the capacity to ask simple questions and request assistance from peers or supervisors. She can maintain interaction with the public. She is able to sustain appropriate interaction with peers and co-workers without interference in work. She is able to sustain socially appropriate work behavior, standards, and appearance.

> She would respond appropriately to changes in a routine setting. She has the ability to be aware of personal safety and avoid work hazards.

Tr. at 303.

On June 4, 2018, state agency medical consultant T. Bessent, M.D. ("Dr. Bessent"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never

climb ladders/ropes/scaffolds; occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs; avoid concentrated exposure to extreme heat, wetness, and humidity; and avoid all exposure to hazards. Tr. at 300–02. A second state agency medical consultant, James M. Lewis, M.D. ("Dr. Lewis"), affirmed Dr. Bessent's physical RFC assessment on September 23, 2018. *Compare* Tr. at 300–02, *with* Tr. at 325–27.

On July 17, 2018, Plaintiff presented to the ER at SRHS with right-sided paresthesia, chest pressure, and "feeling foggy." Tr. at 563. She indicated the symptoms were not exacerbated by exertion and worsened upon lying down. *Id.* She stated she had experienced some nausea, diarrhea, and shortness of breath the prior night. *Id.* Plaintiff's blood pressure was elevated at 170/99 mmHg. Tr. at 564. She reported decreased sensation to her right upper extremity. *Id.* A computed tomography ("CT") scan of Plaintiff's head showed no acute intracranial abnormality. Tr. at 566. Chest x-rays were negative. Tr. at 567. Plaintiff demonstrated no objective neurological deficits. Tr. at 568. A urinalysis was consistent with a UTI, and Dea Fallin, NP, ordered intravenous Rocephin to treat it and admitted Plaintiff for further workup. *Id.* A stress test was unremarkable. Tr. at 577. An MRI showed: no evidence of acute infarction; multifocal white matter signal changes most likely representing chronic small vessel ischemic change given the history of hypertension; and remote lacunar infarctions. Tr. at 811–12. Helen

Stockinger, M.D., assessed a likely transient ischemic attack ("TIA") and discharged Plaintiff with prescriptions for multiple medications she had previously been prescribed, with the exception of Methotrexate. Tr. at 577. She encouraged Plaintiff to be compliant with diet, exercise, and medications and to stop smoking. *Id.*

Plaintiff presented to Dr. Webb for hospital follow up on July 26, 2018. Tr. at 605. She requested to restart Methotrexate for psoriasis and Zolpidem for insomnia. *Id.* Dr. Webb noted obesity, trace bilateral pretibial edema, and 4/5 motor strength in the right upper and lower extremities. *Id.* She assessed sensation alternation and monoplegia of the upper extremity affecting the dominant side as late effects of cerebrovascular disease. Tr. at 606. She also noted psoriasis and primary insomnia. *Id.* She restarted Methotrexate and Zolpidem and authorized refills of Effexor, Lovastatin, Lisinopril, Hydrochlorothiazide, Amlodipine, and Folic Acid. Tr. at 606–07.

On September 20, 2018, Plaintiff presented to the ER at SRHS with worsened shortness of breath. Tr. at 622. She endorsed several months' history of shortness of breath and anxiety and a weeklong history of cold-like symptoms. *Id.* A chest x-ray was negative. Tr. at 625. Lab studies showed elevated creatinine. Tr. at 627. Dr. Konz ordered Vistaril for anxiety, and Plaintiff reported improvement. *Id.* Dr. Konz diagnosed an upper respiratory tract infection, encouraged smoking cessation, and discharged Plaintiff. *Id.*

9

Plaintiff also followed up with Dr. Webb on September 20, 2018. Tr. at 635. She reported three recent panic attacks and continued paresthesia in her arm and hand. *Id.* She said she was not taking Methotrexate because of its cost. *Id.* Dr. Webb noted normal findings on physical exam, aside from obesity with weight of 276 pounds. Tr. at 635–36. She restarted Methotrexate, increased Effexor to 150 mg, and refilled Plaintiff's other medications. Tr. at 636–37.

Plaintiff presented to Nicole Segarra, NP ("NP Segarra"), to establish care on October 4, 2018. Tr. at 1142. She denied following a balanced diet and engaging in regular exercise and admitted she smoked half a pack of cigarettes per day. *Id.* She reported unstable mood with a history of severe anxiety, depression, and anger and a voice inside her head that told her she was worthless. *Id.* She reported no dyspnea, orthopnea, cough, wheezing, arthralgia, soft tissue swelling, joint swelling, or joint stiffness. *Id.* Her blood pressure was elevated at 157/103 mmHg and she weighed 276.2 pounds. *Id.* NP Segarra recorded normal findings on physical exam. Tr. at 1142–44. She assessed adjustment disorder with depressed mood, essential hypertension, body mass index ("BMI") of 42, and other fatigue with lethargy observed. Tr. at 1144. She renewed Plaintiff's prescriptions. Tr. at 1146.

Plaintiff presented to consultative examiner James Ruffing, Psy.D. ("Dr. Ruffing"), for a mental status exam on October 16, 2018. Tr. at 643–45.

She reported "hearing voices" that were angry and negative "thoughts in her head," as well as daily panic attacks lasting up to five minutes, during which she felt overwhelmed and anxious, breathed hard, became short of breath, and felt as if she were dying. Tr. at 643. She reported depression with self-doubt and difficulty trusting others that caused relationship difficulties. *Id.* She said she spent her days watching television, playing a Facebook game, and trying to do housework. *Id.* She admitted she was able to drive, care for her personal needs, attend church once a month, shop in stores on an infrequent basis, pay bills online, order meals in a restaurant, use a phone and computer, prepare meals, clean, and do laundry. Tr. at 644. She reported decreased motivation, low energy, no libido, sleep disturbance, and fleeting suicidal thoughts. *Id.* Dr. Ruffing observed the following on exam: adequately groomed and casually dressed; calm and cooperative; no acute emotional distress; maintained eye contact; spontaneous, responsive, articulate, and fluent speech with normal rhythm, rate, and flow; appropriate affect and euthymic mood; fully oriented with adequate stream of consciousness; linear, logical, relevant, and coherent thought processes; no evidence for psychosis or lack of reality contact; no noticeable distractibility; normal cognitive processing speed; recalled three words immediate and following a delay; spelled "world" correctly forward and backward; scored 30/30 on Folstein's Mini-Mental State Exam; and no indication of auditory hallucinations. Tr. at

644–45. He noted Plaintiff appeared to have a mood disorder consistent with both panic disorder and adjustment disorder with depressed mood. Tr. at 645. Dr. Ruffing wrote the following: "She is able to understand and respond to the spoken word. She appears capable of managing concentration persistence, and pace though this may become compromised during periods of heightened agitation. She does appear capable of managing her finances if awarded benefits." *Id.*

On October 31, 2018, a second state agency psychological consultant, Michael Hammonds, Ph.D. ("Dr. Hammonds"), reviewed the record, considered Listings 12.04 and 12.06 for anxiety and obsessive-compulsive disorders, and assessed Plaintiff's degree of impairment as follows: mild difficulty as to understanding, remembering, or applying information; moderate difficulty in interacting with others; moderate difficulty in concentrating, persisting, or maintaining pace; and mild difficulty as to adapting or managing oneself. Tr. at 320–23. He completed a mental RFC assessment, indicating Plaintiff was moderately limited as to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. Tr. at 327–29. He wrote: "Claimant would be able to maintain attention and

concentration for two hours at a time as required to perform simple tasks, sufficiently to complete an 8-hour day and a 40-hour week. Tr. at 328. He further explained:

> The cl[aimant] is capable of appropriate social interaction with co-workers and supervisors but would do best in an environment, which does not require ongoing public contact. Cl[aimant] is capable of casual and infrequent contact that would be required to answer questions and provide service that was not persistent. Supervision should be direct and nonconfrontational.

*Id.* Finally, Dr. Hammonds noted:

> Claimant is able to adapt to routine changes and respond to directions from others. The cl[aimant] may have difficulty adapting to new situations at work but can adapt to predictable work environments. Cl[aimant] can attend work regularly, make work-related decisions and occupational adjustment, protect against work-related safety hazards and travel to and from work independently.

Tr. at 329.

Plaintiff followed up with NP Segarra to discuss lab results on November 16, 2018. Tr. at 1139. She complained of cramping in her right foot and toes and continued tingling in her right arm and requested that Methotrexate be refilled. *Id.* She denied chest pain, chest discomfort, palpitations, orthopnea, arthralgias, soft tissue swelling, localized joint swelling, localized joint stiffness, motor disturbances, anxiety, depression, and sleep disturbance. *Id.* NP Segarra recorded normal findings on physical exam. Tr. at 1139–41.

On December 7, 2018, Plaintiff reported passing out every other day, frequently sleeping for a few seconds prior to waking, and feeling "winded" upon walking. Tr. at 1135. NP Segarra recorded normal findings on physical exam. *Id.* She ordered an electrocardiogram ("EKG") and referred Plaintiff to a cardiologist and a pulmonologist. Tr. at 1137.

Plaintiff presented to Dhavalkumar Patel, M.D. ("Dr. Patel"), for evaluation of syncopal episodes and heart murmur on January 8, 2019. Tr. at 706. She reported syncopal episodes over the prior month and every other day during the prior week. *Id.* She described the episodes as occurring mostly when she was walking and reported dyspnea and occasional dizziness with ambulation and daytime sleepiness. *Id.* Dr. Patel noted obesity, but no other abnormal findings. Tr. at 709. He ordered an event monitor to rule out arrhythmia as the source of Plaintiff's syncope and indicated he would consider a tilt table test if she continued to experience symptoms. *Id.* He scheduled her for an echocardiogram ("echo") for evaluation of valvular heart disease. *Id.*

Plaintiff presented to David Erb, M.D. ("Dr. Erb"), for evaluation of chronic obstructive pulmonary disease ("COPD") on January 15, 2019. Tr. at 1172. She reported several years' history of dyspnea on exertion, having gained over 30 pounds, a slight smoker's cough, and occasional wheezing. *Id.* She admitted she was very sedentary and reported dyspnea on exertion with

activities of daily living ("ADLs") and walking in stores. *Id.* She endorsed the following on a review of systems ("ROS"): excess weight gain; diminished activity; fatigue; depression; sleep disturbance; and joint swelling and limited motion. Tr. at 1173. Dr. Erb observed Plaintiff to be overweight/obese, to have diminished air movement, and to demonstrate a systolic murmur with aortic stenosis. *Id.* He appreciated no cyanosis, clubbing, or edema in Plaintiff's extremities and no somnolence, confusion, or decreased mental status. *Id.* He noted Plaintiff's spirometry baseline was normal. *Id.* He stated Plaintiff must discontinue smoking, recommended a flu vaccine that she declined, advised exercise and weight loss, and provided a trial of Albuterol HFA for her to use as needed. *Id.* He indicated Plaintiff should follow up with cardiology for aortic stenosis and heart murmur. *Id.* He suspected Plaintiff's dyspnea was due to obesity and deconditioning. *Id.*

Plaintiff followed up with NP Segarra for medication refills on January 18, 2019. Tr. at 1132. She endorsed depression and indicated she continued to be tearful and easily upset despite her participation in counseling. *Id.* She denied chest pain, palpitations, dyspnea, cough, wheezing, nausea, vomiting, abdominal pain, and swelling. *Id.* Her blood pressure was elevated at 139/88 mmHg. *Id.* NP Segarra noted normal exam findings, aside from a heart murmur. Tr. at 1132–34. She assessed adjustment disorder with depressed mood and refilled Plaintiff's medications. Tr. at 1134.

15

On February 12, 2019, Plaintiff endorsed excess weight gain, diminished activity, fatigue, joint swelling and limited motion, depression, and sleep disturbance on an ROS. Tr. at 1170. Channa Supinder, NP ("NP Supinder"), observed Plaintiff to be overweight/obese, to have decreased breath sounds and diminished air movement, and to demonstrate a systolic murmur and aortic stenosis. Tr. at 1170. She specifically noted no cyanosis, clubbing, or edema in Plaintiff's extremities and no somnolence, confusion, or decreased mental status. *Id.* She encouraged smoking cessation, exercise, weight loss, and use of Ventolin as needed. *Id.*

Plaintiff followed up with Dr. Patel on March 14, 2019. Tr. at 694. An event monitor was unremarkable. *Id.* An echo showed normal left ventricular function and mild-to-moderate mitral valve regurgitation. *Id.* Plaintiff reported episodes of dizziness that typically occurred when she felt overwhelmed, but denied recent syncope. *Id.* Her blood pressure was slightly elevated at 134/84 mmHg in the supine position and 132/86 in the sitting position. Tr. at 696. Dr. Patel noted obesity, but no other abnormalities on physical exam. Tr. at 696–97. He indicated Plaintiff's syncope was possibly related to hypotension and dehydration. Tr. at 697. He recommended Plaintiff stay hydrated and advised her to reduce Hydrochlorothiazide to a half dose daily if she experienced further syncope. *Id.* He noted he would

consider a tilt table test if it were needed. *Id.* He prescribed Ventolin HFA and advised Plaintiff to follow up in six months and cease smoking. *Id.*

Plaintiff followed up with NP Segarra for psoriasis and hypertension management on March 25, 2019. Tr. at 1128. She indicated she was following a diet and taking her medication as prescribed. *Id.* She denied chest pain, shortness of breath, and edema. *Id.* Her blood pressure was elevated at 140/94 mmHg and she weighed 276 pounds. Tr. at 1129. NP Segarra recorded normal findings on physical exam. *Id.*

Plaintiff complained of "summer cold" symptoms on April 16, 2019. Tr. at 1165. She weighed 277 pounds and her blood pressure was elevated at 144/87 mmHg. *Id.* She endorsed the following on an ROS: excess weight gain; diminished activity; fatigue; joint swelling and limited motion; depression; and sleep disturbance. Tr. at 1167. Dr. Erb observed Plaintiff to be overweight/obese, to demonstrate decreased breath sounds and diminished air movement, and to have a systolic murmur and aortic stenosis. *Id.* However, he noted no dyspnea, respiratory distress, wheezing, rales/crackles, cyanosis, clubbing, edema, somnolence, confusion, or decreased mental status. *Id.* He advised Plaintiff to use Ventolin as needed, exercise, lose weight, and stop smoking. *Id.*

Plaintiff presented to NP Segarra for medication follow up on August 7, 2019. Tr. at 1124. She reported having awakened with left-sided weakness

one month prior and said she could not remember how to make a sandwich. *Id.* She described dizziness, shortness of breath, and feeling as if she were going to pass out after walking a short distance. *Id.* NP Segarra noted normal findings on exam. Tr. at 1126–27.

On August 13, 2019, Desiree V. Svegliati, LPC ("Counselor Svegliati"), provided a note indicating Plaintiff had begun therapy on November 1, 2018, and had attended 15 sessions, with the last on July 11, 2019. Tr. at 1122. She noted Plaintiff was currently active in therapy and made good therapeutic use of her time. *Id.* An updated note dated September 23, 2019, indicated Plaintiff had participated in 17 sessions, with the most recent on September 5, 2019. Tr. at 1156. She stated Plaintiff remained active, was making good therapeutic use of her time, and deferred a diagnosis. *Id.*

On August 27, 2019, Plaintiff complained of suddenly feeling dizzy and passing out while walking. Tr. at 1163. She endorsed the following on an ROS: excess weight gain; diminished activity; fatigue; joint swelling and limited motion; depression; and sleep disturbance. *Id.* She weighed 283 pounds and her blood pressure was elevated at 150/88 mmHg. Tr. at 1161. Dr. Erb observed Plaintiff to be overweight/obese, to have decreased breath sounds and diminished air movement, and to demonstrate a systolic murmur and aortic stenosis. Tr. at 1163–64. He noted no dyspnea, respiratory distress, wheezing, cyanosis, clubbing, edema, somnolence, confusion, or

decreased mental status. *Id.* He stated Plaintiff must discontinue smoking. Tr. at 1164. He prescribed a trial of Anoro Ellipta, encouraged Plaintiff to use Ventolin as needed, refilled Albuterol, and advised her to exercise and lose weight. *Id.* He suspected Plaintiff's dyspnea was caused by obesity and deconditioning and noted her COPD was stable. *Id.*

On September 27, 2019, Plaintiff endorsed the following on an ROS: excess weight gain; diminished activity; fatigue; joint swelling and limited motion; depression; and sleep disturbance. Tr. at 1160. NP Supinder observed Plaintiff to be overweight/obese, to demonstrate decreased breath sounds and diminished air movement, and to have a systolic murmur and aortic stenosis. *Id.* She noted no cyanosis, clubbing, or edema to Plaintiff's extremities and no somnolence, confusion, or decreased mental status. *Id.* NP Supinder advised Plaintiff to exercise and lose weight and to use Ventolin as needed. *Id.* She suspected Plaintiff's dyspnea was caused by obesity and deconditioning. Tr. at 1160–61.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on October 9, 2019, Plaintiff testified she lived in a house with her 24-year-old son, who received Supplemental Security Income ("SSI") for bipolar disorder, attention deficit hyperactivity disorder ("ADHD"),

and anger issues with intermittent explosive disorder. Tr. at 261–62. She stated she had two teacup chihuahuas. Tr. at 262. She said she had a driver's license and had driven approximately 30 minutes to the hearing. Tr. at 262–63.

Plaintiff testified her last job was as a processor for Adidas, where she worked for five years. Tr. at 263. She indicated she worked part-time at Ingles in 2008 and 2009 and part-time at Wal-Mart in 2006. Tr. at 266. She stated she worked as a cashier at the Mini Mart in 2004 and 2005. Tr. at 266–67.

Plaintiff testified she left her job at Adidas in 2017 because she was experiencing breathing problems and swelling from her right knee to her foot. Tr. at 268. She stated the swelling prevented her from putting on shoes. *Id.* She said her job had required she work 12-hour shifts on a concrete floor, as well as overtime. *Id.*

Plaintiff indicated her breathing and swelling had worsened since she stopped working. Tr. at 269. She said she had swelling in her lower extremities and her right hand. Tr. at 270. She described her swelling as occurring throughout the day and lasting from minutes to hours at a time. *Id.* She stated she elevated her foot above her heart based on NP Segarra's recommendation. Tr. at 271.

Plaintiff testified she experienced a stroke on July 17, 2018, from which she had not recovered. *Id.* She said she had weakness in her right arm and hand. Tr. at 272. She stated she lifted her five-pound chihuahua, but nothing heavier. Tr. at 273. She said she experienced shortness of breath when she walked and cleaned. *Id.* She noted she could perform a task for 10 minutes before having to stop and rest. *Id.*

Plaintiff described pain in her right knee that occurred daily and was worsened by rainy weather. Tr. at 274. She said the pain reduced her ability to stand, which she estimated she could do for 15 minutes. *Id.* She denied being able to bend and pick up an item without holding on to something for support. *Id.* She stated she spent most of her time sitting on her couch and would sometimes watch movies with her son. Tr. at 275.

Plaintiff testified she had anxiety when driving and often felt depressed. *Id.* She said she slept a lot and did not want to socialize or be around others. *Id.* She estimated she slept between eight and 12 hours a day. Tr. at 275–76. She said she experienced a lot of paranoia. Tr. at 276.

Plaintiff denied having seen an orthopedist for her knees. *Id.* She said she lacked the money and insurance to do so. *Id.* She noted she had followed up with a pulmonologist for her breathing difficulties and that he thought her problems were the result of a heart murmur. *Id.* She indicated she was waiting to see a cardiologist for follow up. *Id.*

Plaintiff said some of her swelling was caused by a kidney problem. Tr. at 278. She noted her kidney problem also caused her to feel sleepy. *Id.* She stated her medications were effective, but did not relieve all her problems. Tr. at 279. She denied side effects from medications. *Id.*

   b. Vocational Expert Testimony

Vocational Expert ("VE") William W. Stewart, Ph.D., reviewed the record and testified at the hearing. Tr. at 279–89. The VE categorized Plaintiff's PRW as a cashier-checker, *Dictionary of Occupational Titles* ("*DOT*") number 211.462-014, as requiring light exertion with a specific vocational preparation ("SVP") of 2, and a store laborer, *DOT* number 922.687-058, as requiring medium exertion with an SVP of 2. Tr. at 281. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could, over the course of an eight-hour workday, in two-hour increments, perform work at the light exertional level as defined in the rules and regulations, with the following additional restrictions: never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, kneel, crouch, and crawl; occasionally stoop or lift within the exertional level from floor to waist; frequently stoop or lift within the exertional level from waist height and above; frequently balance; occasionally be exposed to extreme heat, hazards associated with unprotected machinery or unprotected heights, and pulmonary irritants such as fumes, smoke, odors, dust, gases, and poor

ventilation; concentrate, persist, and maintain pace to understand, remember, and carry out unskilled, routine tasks in a low-stress work environment, defined as being free of fast-paced or team-dependent production requirements, involving the application of commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form; deal with problems involving several concrete variables in or from standardized situations; and adapt to occasional workplace changes. Tr. at 282. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 283. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified jobs requiring light exertion as an inspector, *DOT* number 727.687-062 (SVP 2), a bagger, *DOT* number 920.687-018 (SVP 1), and a marker/tagger, *DOT* number 209.587-034 (SVP 2), with 90,000, 61,000, and 70,000 positions available in the economy, respectively. *Id.*

The ALJ next asked the VE to consider an individual of Plaintiff's vocational profile who would be restricted as described in the first hypothetical, except that she could only stand and walk for four hours in an eight-hour workday and could sit for up to six hours in an eight-hour workday. Tr. at 284. The VE testified the individual would be able to perform the inspector job without any reduction in numbers, as he had already identified jobs that would permit reduced standing and walking. Tr. at 284–

85. He indicated the individual would be unable to perform work as a bagger, but could perform a light job with an SVP of 2 as an inspector/hand packager, *DOT* number 559.687-074, with 60,000 positions in the national economy. Tr. at 285–86.

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who would be limited as described in the prior question, but would be off-task for 25 percent of the workday, in addition to normal breaks, and would be absent from work an average of three or more days per month. Tr. at 286. He asked whether the individual would be able to perform any jobs. *Id.* The VE testified she would not. *Id.*

The ALJ asked if Plaintiff's PRW as a cashier-checker produced any transferable skills. Tr. at 287. The VE testified it did not. *Id.* He also noted his testimony as to climbing and stooping specificities, low-stress work, reduced standing and walking at the light exertional level, time off-task, and absenteeism was based on his clinical experience, as such restrictions were not directly addressed in detail in the *DOT*. *Id.* He stated his opinion did not necessarily conflict with the *DOT*, but he supplemented the *DOT* with his professional knowledge where the *DOT* was silent as to particular issues. Tr. at 288. He denied any direct or apparent conflicts between his testimony and the *DOT*. *Id.*

Plaintiff's attorney asked the VE to consider the individual described in the second hypothetical question, but to further assume the individual would need to elevate her legs to waist-level for up to one-third of the workday while sitting. *Id.* The VE testified such a restriction would rule out the jobs previously identified and all other work. Tr. at 288–89.

Plaintiff's attorney asked the VE to explain at what point the level of standing and walking would be exclusively considered sedentary. Tr. at 289. The VE testified, by definition, sedentary work required the worker to sit for six hours a day and stand and/or walk for no more than two hours of the day. *Id.*

### 2.    The ALJ's Findings

In his decision dated November 18, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.
2.    The claimant has not engaged in substantial gainful activity since August 22, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: obesity, bilateral knee arthritis, affective disorder and anxiety disorder (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) over the course of an 8 hour workday, in 2 hour increments with normal

and acceptable work breaks. The claimant can never climb ladders, ropes and scaffolds. She can occasionally climb ramps and stairs, kneel, crouch and crawl. The claimant can occasionally stoop to lift within the exertional level from the floor to the waist. She can frequently stoop to lift within the exertional level from waist height and above. She can frequently balance. The claimant can occasionally be exposed to extreme heat and pulmonary irritants (such as fumes, smoke, odors, dusts[,] gases and poor ventilation) and hazards associated with unprotected dangerous machinery or unprotected heights. She can concentrate, persist and maintain pace to understand, remember and carry out unskilled, routine tasks, in a low stress work environment (defined as being free of fast-paced or team dependent production requirements), involving the application of commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form. She can deal with problems involving several concrete variables in or from standardized situations. The claimant can adapt to occasional work place changes.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on December 9, 1966 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 22, 2017, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–29.

## II.    Discussion

Plaintiff alleges the Commissioner erred in considering the medical opinions of record as it pertained to the RFC assessment. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial

gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are

supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ erred in weighing and accounting for the opinions of the examining and non-examining consultants. [ECF Nos. 17 at 8–15 and 19 at 1–6]. She claims the ALJ was required to evaluate the medical opinions of record pursuant to 20 C.F.R. § 404.1527 and SSR 96-2p. [ECF No. 17 at 8–10]. She maintains the ALJ was prohibited from substituting his opinion for those of the medical providers. [ECF No. 19 at 1–2].

The Commissioner argues Plaintiff errs as to the regulations that the ALJ was to apply in considering the medical opinions of record, and that the ALJ appropriately followed the applicable regulatory framework and considered the persuasiveness of all medical opinions of record. [ECF No. 18 at 9].

ALJs are required to consider the medical opinions of record in evaluating the claim. *See* 20 C.F.R. § 404.1513(a)(2). The regulations include two different sets of criteria for evaluating medical opinions, and the date on which the claim was filed dictates the appropriate framework to apply. *See* 20 C.F.R. §§ 404.1513, 404.1520c. For those cases filed prior to March 27, 2017, the rules for evaluating medical opinions in 20 C.F.R. § 404.1527 apply. *Id.* The rules in 20 C.F.R. § 404.1520c apply in cases filed on and after March 27, 2017. *Id.* Because Plaintiff's claim was filed after March 27, 2017, the

undersigned has considered the medical opinions in accordance with 20 C.F.R. § 404.1520c.

Pursuant to 20 C.F.R. § 404.1520c(a), the ALJ is not required to defer to or give any specific weight to the medical opinions. Instead, he should consider and articulate in his decision how persuasive he found all of the medical opinions based on the factors of: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b), (c). However, supportability and consistency are the most important of the factors. 20 C.F.R. § 404.1520c(a), (b)(2). In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ is required to explain how he considered the supportability and consistency factors in evaluating each medical opinion and may, but is not required to, explain how he considered the other three relevant factors. 20 C.F.R. § 404.1520c(b)(2).

1. Dr. Early's Opinion

Dr. Early opined Plaintiff was a "poor candidate for standing on her feet all day" and a "poor candidate for activities involving crawling, bending, and stooping," given non-pitting right lower extremity swelling, venous stasis, and moderate knee arthritis. Tr. at 554.

Plaintiff maintains the ALJ erred in declining to include restrictions as to standing and walking in the RFC assessment, despite Dr. Early's indication that moderate bilateral knee arthritis and right lower extremity swelling made her a poor candidate for standing and walking all day and for performing activities involving crawling, bending, and stooping. [ECF No. 17 at 10–11]. She claims the ALJ provided invalid reasons for discounting Dr. Early's opinion and did not consider all factors relevant to its weighing. *Id.* at 11–13. She contends the ALJ erred in finding Dr. Early's observations did not support the restrictions he assessed because Dr. Early is a medical professional whose findings formed the basis of his opinion. [ECF No. 19 at 3].

The Commissioner argues the ALJ explicitly assessed the persuasiveness and consistency of Dr. Early's opinion. [ECF No. 18 at 9]. He maintains the ALJ considered the absence of a treatment relationship between Plaintiff and Dr. Early, noting Dr. Early appeared to rely heavily on Plaintiff's subjective presentation. *Id.* at 10. He contends Dr. Early's opinion

33

was contrary to the following in his exam note: Plaintiff's report her knees did not usually limit her exercise tolerance; his note Plaintiff did "not posture in a manner consistent with back pain" and lacked back pain during the exam; his observation that Plaintiff did not have much difficulty walking up and down the hallways or getting on the table; his findings on musculoskeletal exam; nonpitting edema in Plaintiff's legs; Plaintiff's non-antalgic gait and ability to perform tiptoe and heel gait tests; and the fact that Plaintiff had no shortness of breath upon walking approximately 40 feet to the x-ray room. *Id.* He further contends the ALJ discussed inconsistencies between Dr. Early's opinion and the other evidence of record, noting Dr. Early's observation of right lower extremity swelling was not consistent with Plaintiff's longitudinal treatment history. *Id.* at 10–11. He explains the ALJ further noted Plaintiff was not taking medication at the time of Dr. Early's exam. *Id.* at 11. He claims the ALJ also cited the vagueness and absence of function-by-function analysis in Dr. Early's opinion. *Id.*

The ALJ considered Dr. Early's opinion that Plaintiff was "a poor candidate for standing on her feet all day" and "a poor candidate for activities involving crawling, bending and stooping (Exhibit 4F/4)." Tr. at 26. However, he did not "find Dr. Early's opinion to be persuasive." *Id.* He noted Dr. Early had no treating relationship or examination history with Plaintiff and "relied heavily" on her "subjective presentation." *Id.* He stated Dr. Early's opinion

was vague and lacked a specific function-by-function analysis. *Id.* He noted the right lower extremity swelling Plaintiff demonstrated during Dr. Early's exam "was not consistent with her longitudinal treatment history"; there was "no evidence of deep vein thrombosis"; and she was not taking medication at the time of the exam. *Id.*

The ALJ explicitly considered the supportability of Dr. Early's opinion. He summarized Dr. Early's exam as follows:

> The claimant underwent a state agency internal consultative exam with Gordon Early, M.D on May 14, 2018. She complained of right lower extremity swelling with prolonged standing. She also complained of right knee psoriatic arthritis and left knee osteoarthritis. The claimant reported that her knees [did] not usually limit her exercise tolerance or swelling. Instead, she is limited by shortness of breath. Her physical examination revealed some abnormal findings. Dr. Early noted that the claimant was very depressed and the Zung inventory suggests depression. He noted that the claimant did not posture in a manner consistent with back pain and she lacked back pain as of the examination. The claimant did not have much difficulty walking up and down the hallways or getting on the table. Examination of her skin showed about 5% body surface area with psoriatic plaques. The plaques were worse in the intergluteal fold and on the left thigh. On musculoskeletal examination, her hands and toes lacked psoriatic arthritis changes. The claimant had good range of motion in the hands. She also had good range of motion in the upper extremity. The lower extremity showed prominent varicose veins in both legs. There was nonpitting edema in the bilateral legs. Dr. Early noted that the claimant's right leg measured bigger than the left leg at 24.5 inches [o]n the [right] and 24 inches on the left. She measured at 19.4 inches [in the right] calf and 18.1 inches on the left. Both knees flexed about 140 degrees. He noted that they both had 2+ synovial inflammation and a large Q angle. Her gait was not antalgic. Dr. Early noted that the claimant could do tiptoe and heel gait. She did not develop shortness of breath walking to the x-ray room,

> which was approximately 40 feet long. Dr. Early assessed the claimant with right lower extremity swelling that was nonpitting, venous stasis and moderate knee arthritis bilaterally. (Exhibit 4F).

Tr. at 23. The ALJ subsequently pointed out that, although Dr. Early had noted varicose veins and right leg swelling on examination, the record did "not show complaints or diagnosis of deep vein thrombosis" and Plaintiff "also ambulated with a non-antalgic gait." Tr. at 24. Thus, the ALJ cited evidence to bolster his conclusion that some of Dr. Early's observations during the exam did not support the restrictions he assessed.

The ALJ also cited specific evidence aside from Dr. Early's exam notes that was inconsistent with his opinion. As noted above, he pointed out Plaintiff had not been diagnosed with deep venous thrombosis. Tr. at 24, 26. He indicated Plaintiff "ambulated with a normal gait," did not complain of musculoskeletal pain, and demonstrated no peripheral edema in July 2017. Tr. at 22. He acknowledged an observation of 1+ pretibial edema during an August 11, 2017 exam, but stated Plaintiff did not complain of leg swelling and received no treatment for leg pain, knee pain, or swelling. *Id.* He noted Plaintiff had trace bilateral lower extremity edema during an ER visit on February 16, 2018, but had full ROM and no calf tenderness. Tr. at 22–23. The record supports the ALJ's statement that Dr. Early's observation of lower extremity swelling "was not consistent with [Plaintiff's] longitudinal treatment history." Tr. at 26. Although, as the ALJ noted, Plaintiff's

providers observed mild swelling or trace edema on a few occasions, Tr. at
520, 546, 605, the majority of the records reflect her providers' notations of no
swelling or edema. *See* Tr. at 524, 1128, 1139, 1142, 1160, 1164, 1167, 1170,
1173. The ALJ also considered Plaintiff was not taking medication at the
time of Dr. Early's exam as a possible explanation for inconsistent findings
between Dr. Early's exam and other exams in the record. *See* Tr. at 26. This
was a reasonable inference, as most of the records after Dr. Early's exam,
during the period when Plaintiff was obtaining medications and treatment
more regularly, do not reflect observations of edema or swelling.

Although he was not required to do so pursuant to 20 C.F.R. §
404.1520c, the ALJ articulated how he had considered the relationship
between Plaintiff and Dr. Early. *See* Tr. at 26. He noted Dr. Early had no
treatment relationship with Plaintiff and there was no history of
examination. *See id.*

The ALJ also considered the opinion on its face, noting it was vague
and lacked a specific function-by-function analysis. *See id.* The ALJ's
reasoning is sound in that Dr. Early did not specify what he meant in
describing Plaintiff as "a poor candidate for standing on her feet all day" and
"a poor candidate for activities involving crawling, bending and stooping." Dr.
Early did not express the restrictions in vocational terms, and the restrictions
leave much room for interpretation such that an individual who could not

stand "on her feet all day" might be able to stand only occasionally, sit for half the day and stand for half the day,[3] or perform frequent, but not constant standing. Furthermore, although Dr. Early described Plaintiff as "a poor candidate for crawling, bending, stooping," he did not specify whether she could never, rarely, or occasionally perform those functions.

The undersigned rejects Plaintiff's argument that the ALJ was "improperly 'playing doctor'" in contravention of the Fourth Circuit's holding in *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) and the applicable regulations. In *Lewis*, the court cited a decision from the Seventh Circuit, *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015), finding that an ALJ was improperly "playing doctor" where his conclusions were "not supported by any medical evidence in the record." That is not the case here. The ALJ cited ample medical evidence to support his rejection of Dr. Early's opinion. Plaintiff also appears to argue that the ALJ was not permitted to reject Dr. Early's opinion as unsupported by his findings on exam because Dr. Early was a medical professional who considered findings of prominent varicose veins in the bilateral legs, nonpitting edema, a difference in calf and thigh

---

[3] Although the ALJ did not reduce Plaintiff to standing and walking for four hours out of an eight-hour workday in the RFC assessment, he noted in the decision that the VE had testified that the same jobs would be available with such a restriction if he had included it. Tr. at 29. Thus, if the ALJ had interpreted Dr. Early's opinion as one that Plaintiff could stand and walk for only half the day, he maintained he would have reached the same conclusion at step five. *See id.*

circumference between the right and left legs, and 2+ synovial inflammation in the knees with decreased flexion sufficient to support the restrictions he assessed. [ECF No. 19 at 3]. However, Plaintiff's argument disregards the ALJ's duty to assess the persuasiveness of the entirety of the opinion pursuant to 20 C.F.R. § 404.1520c. The ALJ considered the findings Dr. Early cited to support his opinion, but also considered other evidence from his exam and the other evidence of record that did not support his opinion. The ALJ considered the entire record in assessing Dr. Early's opinion, and was not "playing doctor" in contravention of the regulations or Fourth Circuit precedent.

In light of the foregoing, the court finds the ALJ considered Dr. Early's opinion in accordance with 20 C.F.R. 404.1520c and cited substantial evidence to support his finding that it was not persuasive.

### 2.    Dr. Hammonds's Opinion

Dr. Hammonds assessed moderate difficulty in Plaintiff's ability to interact with others. Tr. at 320. He indicated in a mental RFC assessment that Plaintiff had moderate limitation in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting. Tr. at 327–29.

Plaintiff contends the ALJ declined to include in the RFC assessment a provision limiting her interaction with others, despite Dr. Hammonds's assessment of moderate limitations in interacting with others, and provided no reason to support his failure to restrict her interaction. [ECF No. 17 at 14–15]. She claims the ALJ failed to cite evidence that justified the rejection of Dr. Hammonds's opinion because no such evidence existed. [ECF No. 19 at 6].

The Commissioner argues the ALJ properly accounted for all limitations in Plaintiff's interactive ability that were supported by the record, as the exclusion of team work, requirement of a low-stress environment, and limitation to unskilled labor addressed her ability to interact with others. [ECF No. 18 at 11]. He maintains that, although the ALJ did not assess moderate difficulties in interacting with others as Dr. Hammonds indicated, the limitations he included in the RFC assessment were consistent with Dr. Hammonds's opinion. *Id.* at 12–13. He contends the ALJ's RFC assessment was consistent with Dr. Ruffing's observations and opinion. *Id.* at 13. He claims the ALJ also noted that Plaintiff did not allege any difficulty getting along with coworkers and supervisors, experienced more significant symptoms when she was not taking her medication, and was able to shop in stores and attend church services once a month. *Id.* at 13–14.

The ALJ summarized Dr. Hammonds's opinion and found it "well persuasive." Tr. at 27. Although he noted that Dr. Hammonds was a non-

treating and non-examining medical source, he credited his review of the record, his specialization in the area of mental health, and his familiarity with the Social Security Administration's ("SSA's") policies, regulations, and definitions regarding disability. *Id.* However, he found the evidence submitted at the hearing level did not support the moderate limitation he assessed as to interacting with others. *Id.* Thus, the ALJ considered Dr. Hammonds' opinion "well persuasive," except the portion of his opinion assessing a moderate limitation in interacting with others. Plaintiff does not challenge the ALJ's finding that Dr. Hammonds's opinion was "well persuasive," but instead argues that the finding should have extended to his assessment of moderate difficulty in interacting with others. [ECF No. 17 at 14–15].

The ALJ considered the consistency of Dr. Hammonds's opinion with the other evidence of record in accordance with 20 C.F.R. § 404.1520c in rejecting the assessment of moderate difficulty and finding that Plaintiff had only mild difficulty in interacting with others. Tr. at 19. Contrary to Plaintiff's argument, the ALJ supported his conclusion with the following explanation:

> In written statements, the claimant alleged problems getting along with others. She indicated that other than interacting with her son and mother, she did not socialize with others. At the hearing, the claimant alleged that she has anxiety attacks. The evidence in this case fail[s] to support the claimant's allegations of significant limitations interacting with others. The claimant

testified that prior to her alleged onset date, she worked as a cashier at Adidas on most days, she worked 12-hour shifts. This work certainly involve[d] some interaction with others. Again, the claimant alleged that she stopped working due to physical impairments as opposed to psychological based symptoms. She did not allege any problems getting along with supervisors or her coworkers. The record indicates that the claimant had some periods of anxiety attacks. However, it appears her symptoms were exacerbated when she was not taking her medications as prescribed (Exhibit 1F). Her mental status exams document[] normal mood and affect (Exhibit 18F). While she alleges that she has auditory hallucinations, there is simply no evidence to support this symptom as the claimant was not prescribed antipsychotic medications. Dr. Ruffing also noted that there was no indication of auditory hallucinations or schizophrenia. The claimant is able to shop in stores and attend church services once a month. Accordingly, the undersigned finds that the claimant has a mild limitation interacting with others. (Hearing Testimony; Exhibits 4E; 9F).

Tr. at 19–20. The ALJ addressed Plaintiff's ability to interact with others in the RFC assessment by restricting her to a "low stress" work environment "free of . . . team dependent work requirements" with "occasional work place changes." Tr. at 21.

The ALJ discussed other factors he considered in evaluating the persuasiveness of Dr. Hammonds's opinion. *See* Tr. at 27. He briefly addressed the supportability factor in accordance with 20 C.F.R. § 404.1520c, noting Dr. Hammonds had neither treated nor examined Plaintiff, but had reviewed her longitudinal record. *Id.* He also considered Dr. Hammonds's specialization, noting his familiarity with factors relevant to the SSA disability evaluation and his mental health specialty. *Id.*

The ALJ noted evidence that both supported and conflicted with Dr. Hammonds's opinion and provided a cogent explanation for his decision to find the opinion "well persuasive," except as to moderate difficulties in interacting with others. He discussed the supportability and other factors relevant to his evaluation of Dr. Hammonds's opinion and emphasized the inconsistency between the assessment of moderate limitations in interacting with others and the other evidence of record. Therefore, the ALJ complied with the provisions of 20 C.F.R. 404.1520c in considering the persuasiveness of Dr. Hammonds's opinion. He did not impermissibly "play doctor" in rejecting a portion of Dr. Hammonds's opinion, as he cited ample evidence throughout the record that conflicted with the restriction.

Even if the ALJ had assessed Plaintiff as having moderate difficulties in interacting with others, as Dr. Hammonds suggested, he would have reached the same conclusion given Dr. Hammonds's explanation and opinion as to functional limitations. Dr. Hammonds explained:

> The cl[aimant] is capable of appropriate social interaction with co-workers and supervisors but would do best in an environment, which does not require ongoing public contact. Cl[aimant] is capable of casual and infrequent contact that would be required to answer questions and provide service that was not persistent. Supervision should be direct and nonconfrontational.

*Id.* He further stated Plaintiff was "able to adapt to routine changes and respond to directions from others" and "may have difficulty adapting to new

situations at work but can adapt to predictable work environments." Tr. at 329.

The ALJ found Plaintiff could perform jobs that were consistent with the specific limitations Dr. Hammonds identified. He restricted Plaintiff to a "low stress" work environment with no "team dependent work requirements" and only "occasional work place changes." Tr. at 21. He relied on the VE's testimony to find that Plaintiff could perform jobs as an inspector, a bagger, and a marker. Tr. at 28–29. A review of the *DOT*'s descriptions of the jobs of inspector, bagger, and marker indicates the following for all three: "People: 8–Taking Instructions–Helping" and "N–Not Significant." *See* 727.687-062, INSPECTOR. *DOT* (4th Ed., revised 1991), 1991 WL 679674; 920.687-018, BAGGER. *DOT* (4th Ed., revised 1991), 1991 WL 687965; 209.587-034, MARKER. *DOT* (4th Ed., revised 1991), 1991 WL 671802. This court previously noted that other courts had interpreted an indication of "Not Significant" as to "People: 8–Taking Instructions–Helping" to mean that "interaction with the public and/or coworkers and supervisors was not significant or no more than occasional." *Praylow v. Colvin*, C/A No. 9:15-3557-TMC-BM, 2016 WL 11200706 at *11 (D.S.C. Sept. 7, 2016), adopted by 2017 WL 676580 (D.S.C. Feb. 21, 2017) (quoting *Arsenault v. Astrue*, C/A No. 08-269-P-H, 2009 WL, 982225, at *3 (D. Me. Apr. 12, 2009)). Thus, the jobs the ALJ relied on to meet the Commissioner's burden at step five are generally

consistent with the functional restrictions Dr. Hammond provided as to interacting with others.

The court rejects Plaintiff's argument because the ALJ considered the persuasiveness of Dr. Hammonds's opinion in accordance with the applicable regulations, provided good reasons for reaching a finding contrary to Dr. Hammonds's opinion as to difficulties in in interacting with others, and would have reached the same conclusion even if he had given more credit to Dr. Hammonds's opinion.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

January 20, 2021                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge